Filed 1/18/23  In re Bella A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re BELLA A., a Person Coming Under the Juvenile Court Law. | B315576 (Los Angeles County Super. Ct. No. 21LJJP00244) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KARINA C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Karina C. (mother) appeals from a judgment of the juvenile court asserting jurisdiction over her daughter Bella A. (born April 2021). Mother challenges the juvenile court's jurisdictional findings concerning her conduct and the dispositional order removing the child from her custody. We find substantial evidence supports the juvenile court's findings and dispositional order and affirm the judgment.

 **COMBINED FACTUAL AND PROCEDURAL BACKGROUND**
**Referral and investigation**

The Los Angeles County Department of Children and Family Services (DCFS) received a referral on April 23, 2021, alleging that Bella, who was hospitalized in the neonatal intensive care unit (NICU) at Antelope Valley Hospital Women and Infant Pavilion, was a victim of general neglect and emotional abuse by mother and Robert A. (father).[1]

In April 2021 Bella was born premature at 34 weeks.[2] Bella was in the NICU since birth and had no discharge date. She was on a feeding tube. On April 19, 2021, father cut the feeding tube off in two separate places and threw the pieces in the trash without telling the hospital staff. Father stated that he cut the tubes because they were "bothering" Bella. When medical staff gave direction to father, he would say, "This is what I want, thanks," and turn around, refusing their directions.

Hospital staff noted father was "abrasive," and when he visited he hovered over the bassinet and did not allow the hospital staff to do the things they needed to do for the child. The hospital social worker observed something wrong with father's mental

---

[1]     Father is not a party to this appeal.

[2]     Mother received limited prenatal care.

2

health, as he would not engage with her or the nurses. Father took pictures of all paperwork, claiming that his attorney wanted the medical records.

When mother and father visited the child, father would not allow mother to hold the child. Mother did not ask any questions about the child in the father's presence and told the social worker she was not allowed to ask questions about the baby. During a telephone call, mother informed the social worker that she was not able to talk freely. Mother attempted to remove father from the visitor list, but then reinstated him.

Mother claimed to be unaware of father cutting the baby's feeding tubes, as she was in the bathroom when the incident occurred. The parents were uncooperative about providing mother's contact information to the hospital. The telephone number given was not in service, and father would not provide them with another number for mother. The reporting party was concerned about the parents' ability to care for the child.

On April 27, 2021, the attending physician told the parents that Bella was ready to be discharged. However, when the parents arrived at the hospital they were informed that the baby could not be discharged due to a dip in her oxygen levels. Father became upset, insisting his family was waiting at home with a cake. After father left, the baby was found with a blanket covering her arm and face and all the hospital cords and a stethoscope on her abdomen.

Father continued to show abnormal behavior. When he asked the hospital for formula for the baby, he was informed that she had three more containers of NICU formula left until a new shipment arrived. When the nurse returned, the baby formula was gone. The hospital social worker reported that father stole the formula despite being told that these were the last three containers available for the baby.

The social worker also observed father feeding the baby while she was lying on her back after having been made aware that feeding her while she was in that position put her at risk of choking and suffocation. Father reported that mother would be the child's part-time caregiver, and he would serve as her primary caregiver. The hospital social worker expressed serious concern as to the safety of the baby if released to the parents.

A social worker interviewed paternal grandmother (PGM) at the maternal grandmother's (MGM) home, where PGM was staying until May 10, to assist with the baby. PGM planned to visit every two weeks after that. PGM had no concerns about the parents' ability to care for the baby and stated that father did not have any developmental delays or health problems. She denied any knowledge of father using drugs.

A social worker also spoke with MGM, who did not work and planned to teach the parents how to support and care for the baby. MGM did not have any concerns about the parents' ability to care for the child.

The social worker visited the child at the hospital, where she had not passed the newborn screening or reached a normal birth weight. She had a condition called malonic acidemia that would require further investigation. Bella's head was smaller than normal, and she had an anomaly on her left ear. The hospital reported that mother was diabetic and confirmed that father's behavior was concerning. They reported he did not make eye contact and often acted as though staff was not present. He was abrasive to hospital staff and was "hell bent" on being right. Father seemingly found everything the medical staff did to be wrong, and he accessed the child's medical charts without permission. Hospital staff informed the social worker that after father's visit on April 27, 2021, she was found with a blanket over her head and medical cords

4

and a stethoscope on her abdomen. They also confirmed that father had cut the baby's feeding tube on April 19, 2021, which was extremely dangerous to the baby. When confronted about his conduct, father replied the tubes looked like they were bothering the baby. He showed no remorse and did not acknowledge having done anything wrong.

Hospital staff found father controlling of mother. Mother had disclosed that father did not allow her to hold the baby or ask questions about her. When staff informed mother of the baby's progress, mother was initially happy and expressive. However, when mother learned that father was in the NICU, mother's demeanor changed completely. After a long pause, mother asked the staff whether father was alone in the hospital and asked the nurse not to tell father that she was on the phone. During another conversation, when staff asked mother for her telephone number, mother responded that they should ask father, who required mother to ask father's permission to provide her telephone number.

Hospital staff were concerned that mother and father would not obtain the necessary care to meet the child's special needs. Based on the parents' behavior, there was concern that the child would suffocate or choke if released to the parents.

In a telephone conversation between the social worker and mother, mother repeated that she had been in the restroom when father cut Bella's feeding tube. Mother reported having learned of the incident from a nurse. Mother said father told her he cut the tube because it was slipping out and the child was struggling to breathe. Mother denied that she or father left tubing or a stethoscope on the baby's abdomen. Mother also denied telling a nurse that she was not allowed to hold the baby or ask questions when father was present. She denied taking father's name off the visitation list. Mother maintained that father was joking when he

5

said that he would be the child's primary caregiver. Mother stated she and father worked so MGM and PGM would be the primary caregivers.

Father admitted to the social worker that he had pulled and cut the feeding tube. He said part of the tube was detached and that he saw formula coming out of the baby's nose and mouth, her face turning red, and her eyes turning back. Father knew the baby was choking and removed the tube from her nose in a moment of panic. He said Bella then regained her normal color. Father did not intend to harm the child. When asked why he did not alert hospital staff when he believed Bella was choking, father said he knew Bella was choking and did what he felt was appropriate. Initially father stated that he called for a nurse but got no response. After he pulled out the tube, he did not want to bother medical staff. Contrary to mother, father reported that mother was present during the incident.

Father denied feeding the baby while she was lying down flat and that he left hospital wires or a stethoscope on the baby's abdomen. Father admitted to hovering over the baby but stated that this was a normal thing for a father to do. Father explained the tension with the hospital staff was because he requested all of Bella's official paperwork, as he did not agree with the manner in which the hospital was caring for Bella, and he would be getting a lawyer involved.

**Protective custody warrant and petition**

On April 23, 2021, the social worker's request for a protective custody warrant to detain the child from mother and father was granted.

On May 3, 2021, DCFS filed a petition on behalf of the child pursuant to Welfare and Institutions Code section 300, subdivision

6

(b),[3] which alleged that mother and father placed the child in a detrimental and endangering situation when father cut the child's feeding tube in the hospital. Further, after father's visit the child was found with a blanket over her head and cords and a stethoscope on her abdomen. The petition also alleged that father fed the child while she was lying on her back, which could cause the child to choke, and would not allow mother to hold the baby. Mother failed to protect the child from father's behavior and allowed the father unlimited access to the child. The petition alleged that father's and mother's behavior endangered the child's physical health and safety and placed her at risk of serious physical harm.

On May 6, 2021, DCFS filed a last minute information for the court reporting that on May 3, 2021, the social worker had telephone contact with a family member who did not wish to be identified. The family member advised that father is gang affiliated, and he had concerns, based on observations, that father smoked marijuana and consumed alcohol.

**Detention hearing**

The detention hearing was held on May 6, 2021. The parents appeared via Webex. The child remained hospitalized. Father was found to be the child's presumed father.

Mother's counsel argued for release of the child or unmonitored visitation. Minor's counsel joined with DCFS to request detention, arguing that mother had not been honest with DCFS and had denied father's actions. Over mother's objection, the juvenile court made detention findings. The court ordered that the parents' visits with the child be monitored and that they not visit her together.

---

[3]     All further statutory references are to the Welfare and Institutions Code.

**Jurisdiction/disposition report**

DCFS filed a jurisdiction/disposition report on June 16, 2021, reporting that Bella had been placed with MGM.

Bella, born prematurely at 34 weeks, had experienced respiratory distress during the second week of her life, requiring supplemental oxygen. Bella also had an ear abnormality and a feeding intolerance. Her left ear was very small, malformed, and did not have an ear canal. She failed the hearing screening on her left side and was to be referred to an audiologist upon discharge. Mother's history showed a pregnancy that was complicated by her diabetes and poor insulin control. Also, she had been hospitalized two months prior to the child's birth but "went AGAINST MEDICAL ADVICE."

During an interview, when asked about the incident with the feeding tube, father insisted that Bella was choking and stated: "I reacted to it way fast. . . . I reacted fast without calling for help. I have 2 kids so I did the best of my knowledge." Father stated he used a nose suction tool to suction the milk out of her nose. He then trimmed the feeding tube and put new clothes on Bella. Father continued to deny knowing anything about the incident in which Bella was found with a blanket covering her head and tubes and a stethoscope on her abdomen. He also denied feeding her while she was lying on her back, insisting that she was tilted up. Father denied not allowing mother to carry the child, domestic violence, and being in a gang. He denied using drugs and admitted he drank one beer a day. He denied any mental health diagnoses or issues. Father claimed two children from a prior relationship that he saw "every now and then."

During an interview with mother, she reported that when Bella's eyes rolled back, she could not breathe and had milk coming out of her nose, father "freaked out." Mother stated that she was in

shock when she saw father cut the feeding tube because the child was not breathing normally. Mother thought the child was having a seizure. They did not call a nurse because it happened so fast. Mother admitted she was present in the room and saw father cut the feeding tube. Mother denied that father left a stethoscope or tubes on the child's abdomen or a blanket over her face. Mother denied that father did not allow her to carry the child.

Mother admitted that when she and father had an argument, she told the hospital not to let father into the facility, which she later retracted. She insisted that he was a good father.

Father had an extensive criminal history showing charges, including threats with intent to terrorize, hit and run, and reckless driving, among others. Mother had no criminal history.

Mother and father used to live with MGM, who had never seen father be possessive or rude and had never seen the parents fight. MGM knew that father used marijuana once in awhile, but she had never seen him use it. MGM was worried about mother who had lost a lot of weight. MGM thought mother might have postpartum depression. MGM felt that the parents should participate in psychological evaluations. MGM reported father could be grumpy and had been told that father was verbally aggressive. MGM felt that father needed anger management classes.

Mother's brother, Jose, reported that he had not seen any physical incidents between mother and father, but the mobile home managers warned MGM about father and his friends sitting in the front yard drinking alcohol and smoking weed. Jose reported that he had never seen mother as thin as she was, and she was in and out of the hospital during her pregnancy due to her diabetes. He said MGM had to push mother to get her insulin. Jose believed mother needed mental health assistance.

9

The parents submitted to drug testing on May 19, 2021. They both tested negative for all substances.

In a last minute information for the court filed on September 27, 2021, the social worker reported that MGM had concerns about the parents' lack of interest in the child's well-being, having missed visits without notice. When father visited, he would not hold Bella. Instead, he would put her down and turn on cartoons for her to watch. To feed Bella, father would not pick her up but instead would place the baby on her back and prop her up with a blanket.

MGM reported that mother's health had deteriorated, and mother refused to address her health needs. MGM was concerned that mother could not take care of the child if she could not take care of herself.

MGM and mother did not have a good relationship. Mother did not listen to MGM's advice, and the parents lied and made inconsistent statements, including whether or not mother was present when father cut the feeding tubes. Father insisted that he was permitted unmonitored visits with Bella. When MGM told father she could not permit him to have unmonitored visits with the child until the social worker informed her it was permitted, father told her in Spanish using vulgar language that he did not care about the court's orders.

MGM knew that father smoked marijuana, but she learned he also smoked something in a glass pipe with a bulb. Father had been up all night smoking in a car outside MGM's home the night before he cut the baby's feeding tube. MGM was concerned father would continue to use substances if the child were in his custody.

MGM reported that mother refused to attend any of the child's medical appointments, despite previously agreeing to attend.

MGM said mother reported being depressed but refused any assistance.

MGM reported that the parents did not attend visits on September 24 or September 27, 2021.

Based on their recent behavior, MGM was unwilling to permit mother or father to reside in her home.

**Jurisdiction/disposition hearing**

The juvenile court conducted the combined jurisdiction/disposition hearing on August 17, 2021, and September 28, 2021, admitting into evidence DCFS's reports. Mother and father testified.

Father testified that he and mother were living together and attending a parenting class together. Father was on a waiting list for counseling and anger management. Regarding the feeding tube incident, father acknowledged that he took the feeding tube out but stated that he did not hurt his daughter. Father also denied leaving the child with a blanket over her head and stethoscope and tubes on her abdomen. Father heard what the nurses were telling him about caring for a baby but testified that he "already knew all that stuff" because he had two older kids. He testified that he propped the baby up with blankets when he fed her.

Father did not tell the nurses about his concern for the child before he cut her feeding tube. The tube had been removed from the baby's nose for an hour and a half before the nurses discovered what he had done. Father testified that mother was present when he cut the tube and took it out of the baby's nose and that she did not try to stop him. Father denied stealing baby formula from the hospital.

Mother testified that she was present when father cut the baby's feeding tube. Other than that incident, mother believed father never interfered with Bella's health. Mother stated that

11

father would never jeopardize the child's health.  When she observed father cutting the feeding tube, mother had no reason to believe he was interfering with her care.  However, later in her testimony mother admitted that father's act of cutting the feeding tube was harmful to Bella.  She did not immediately react because it happened so fast.  Once she realized what had happened, mother "sided with" father, because the baby wasn't breathing right and he responded in the moment.  Mother admitted she did not contact the nurse after father cut the feeding tube.  Mother denied that the baby was ever left with a blanket over her head.  Mother observed father feeding Bella while she was lying on her back, but denied that she was lying down flat.

Mother denied that father would not allow her to pick up Bella.  Instead mother stated that she did not pick up Bella because she did not want to disconnect the cords.

Mother denied postpartum depression.  She testified that she was managing her diabetes and saw her doctors regularly.  Mother denied ever having removed father from the visiting list at the hospital.  Mother had not yet enrolled in counseling, but she was enrolled in a parenting class.  She denied telling MGM that she felt depressed.

Mother missed two recent visits due to a lack of transportation.  While she admitted the social worker gave her the opportunity to attend Bella's medical visits, mother had not attended any of the appointments.

Father's counsel argued that the petition should be dismissed in its entirety.  Mother's counsel argued that the petition should be dismissed in its entirety or, in the alternative, that mother should be nonoffending.  Bella's counsel asked the juvenile court to sustain the section 300 petition as pled, pointing out that the hospital staff did not have a motive to lie and that mother had an answer for

everything father did. County counsel also argued in support of sustaining the section 300 petition, observing that father's conduct was very concerning and that mother had lied and failed to express any concerns about father's actions.

The juvenile court found the parents' statements contradictory and found neither parent credible. The court found father ignored medical advice to the detriment of the child and that father did not understand that his behavior was harmful to the child. The court found father was controlling mother's behavior, and mother was failing to protect the child by allowing father's control. The court found both parents relied on their own decisions and ignored medical advice to the detriment of the child. The juvenile court sustained the petition and proceeded to disposition.[4]

The court heard additional argument from counsel in the dispositional phase. Father's counsel argued that the child be released to one or both parents. Mother's counsel joined father's counsel's argument and asked that the child be released to mother if it was not inclined to release her to father. In the alternative, she requested unmonitored visitation. The child's counsel and DCFS asked that the court remove the child from the parents' custody and require that their visits be monitored.

The juvenile court declared the child a dependent of the court and removed the child from the parents' custody. Father placed his own judgment above that of medical professionals, and the court had no reason to believe that father would follow the advice of medical professionals. Father's behavior and actions established that he was not receptive to services, and there were no safety measures that could be put in place.

---

[4] The juvenile court amended the count in the petition to find that the risk of harm to the child was "substantial."

13

With respect to mother, the court expressed concern that mother was under the control of father and thus would not follow any court orders or recommendations from medical or other professionals regarding treatment. The court found by clear and convincing evidence that there existed a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home to the parents, and there were no reasonable means to protect the child without removing the child from the parents' custody.

The court ordered the parents to participate in services and that their visits with the child be monitored.

On October 4, 2021, mother filed her notice of appeal from the court's orders.

## DISCUSSION

### I. Jurisdictional findings

Mother first challenges the court's jurisdictional findings, asserting that the court lacked substantial evidence to sustain the failure to protect allegation involving mother.

#### A. *Applicable law and standard of review*

Section 300, subdivision (b) permits a juvenile court to assert jurisdiction over a child where the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of the parent or guardian to adequately supervise or protect the child. There are three elements to jurisdiction under section 300: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.'" (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)

A juvenile court's jurisdictional findings are reviewed for substantial evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.) Substantial evidence consists of evidence that is "'reasonable, credible and of solid value,'" which would allow a reasonable trier of fact to reach the conclusion that the trial court reached. (*In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080.) Under this standard, we must review the entire record in the light most favorable to the findings and conclusions of the juvenile court. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.) We do not reassess the credibility of witnesses or reweigh the evidence. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) If substantial evidence exists, controverted or not, we must affirm the juvenile court's findings. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020-1021.) The ultimate test is whether it is reasonable for a trier of fact to make the ruling in light of the whole record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

**B.** ***Substantial evidence supports the juvenile court's jurisdictional findings***

The single count sustained in the section 300 petition in this matter contains the following allegations:

> "The child, [Bella A.'s] mother . . . and father . . . placed the child in a detrimental and endangering situation in that the father cut the child's feeding tubes with scissors while the child was in the hospital. Further, on 04/27/2021, following father's visit with the child, the child was found with a blanket over the child's head, and cords and a stethoscope were found on the child's abdomen. Further, the father fed the child while it was lying on its back and the child could have choked. The father would not allow the mother to hold the child in the hospital. The mother knew or reasonably should have known of the father's actions and failed to protect the child in that the mother

15

allowed the father to have unlimited access to the child. Such a detrimental and endangering situation established for the child by the mother and father and the mother's failure to protect the child endangers the child's physical health and safety and places the child at substantial risk of serious physical harm, damage and danger and failure to protect."

Substantial evidence supports these jurisdictional findings. Both mother and father acknowledged that father cut the child's feeding tube and removed it without medical authorization. Both parents also admitted that the child appeared to be in medical distress, with her eyes rolling back and her breathing compromised, yet neither of them summoned medical assistance before father cut the feeding tube. Although mother thought that the baby was having a seizure, she never summoned medical assistance, before or after father cut the tube.

While mother initially lied and stated that she did not witness father's act of cutting the feeding tube, she later admitted that she was present and did nothing to intervene. Mother's failure to act when her child was in medical distress and her failure to intervene in father's harmful act of removing the child's feeding tube, shows a failure to protect the child. Mother's continued insistence that father would do nothing to harm the baby, in the face of credible evidence that father has put the child at risk by leaving objects on her body and failing to feed her properly, also shows a failure to protect the child. Mother's failure to protect the child from father's dangerous acts put the child at substantial risk of physical harm. Further, mother continues to insist that father's act of cutting the child's feeding tube was not problematic or detrimental. At the hearing, she testified that she "sided with [father]" when she realized what he had done, rather than seek help from medical professionals. Given that mother continues to take

16

father's side on his troubling behaviors with the baby, there is no reason to believe that if father again disregarded medical instructions, mother would protect her medically fragile baby.

Mother argues that insufficient evidence exists that there was a current risk of harm to Bella due to mother's failure to protect her. Mother argues that jurisdiction may not be based on a single incident of neglectful conduct, even when that incident results in harm to the child, absent evidence of a current risk of harm. (Citing *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023 (*J.N.*).) First, mother's argument is based on the faulty premise that the juvenile court was required to accept the parents' position that the cutting of the feeding tube was the only incident of endangering conduct. On the contrary, the juvenile court was not required to accept the parents' denials of subsequent acts of harm to the child. The hospital staff and MGM provided competent evidence that father engaged in additional acts harmful to the child, including leaving her with objects on her body that could have harmed her, feeding her lying down despite warnings that this could be extremely dangerous to her, and showing disregard for court orders intended to protect the child.

Further, *J.N.* is distinguishable. In *J.N.*, the parents were involved in one incident of driving under the influence with their minor children in the car. In contrast to the matter before us, the parents expressed remorse and showed a willingness to learn from their mistake. (*J.N., supra*, 181 Cal.App.4th at p. 1026 ["Significantly, both parents were remorseful, loving, and indicated that they were willing to learn from their mistakes."].) Here, both parents continue to defend father's act of cutting the feeding tube, without any remorse or understanding that disregard of medical treatments and protocols is dangerous to the child.

17

Mother next argues that there is insufficient evidence that any similar incidents would occur in the future and that speculation cannot support a finding of dependency. (Citing *In re Steve W.* (1990) 217 Cal.App.3d 10, 22.) However, the juvenile court did not rely on speculation in this case. Father's disregard of instructions from medical professionals and the court continued to pose a danger to the child throughout the proceedings. MGM provided evidence that father continued to feed the child while lying on her back and expressed disdain for the court orders in place to protect the baby. Mother continued to support father and defend his actions in spite of the potential harm to Bella. Mother testified at the hearing that other than the one incident of cutting the feeding tube, father never interfered with the baby's health. She insisted that father would never jeopardize the child's health. Mother continued to deny that the baby was ever left with a blanket over her head or that father fed the child in a way that could cause her harm. Given the baby's very young age and vulnerable state, mother's failure to stand up for the child's safety was particularly dangerous to the child.

Under the circumstances, sufficient evidence supported the juvenile court's decision that the conduct of mother in continuing to defend father posed a substantial risk to the child's health.[5]

-----

[5] Mother dedicates a substantial portion of her opening brief to her argument that the juvenile court's finding that there was domestic violence between mother and father was not supported by the record. The single count sustained in this matter made no reference to domestic violence. As the court did not sustain a finding of domestic violence, we decline to address this point. We note that the court orally observed that mother appeared to be "under the control" of father. The court used these words to describe mother's failure to assert herself to protect the child's health and well-being, which supported the court's decision to

18

## II. Dispositional order of removal

Mother challenges the juvenile court's dispositional order removing Bella from her custody.

### A. *Applicable law and standard of review*

Section 361, subdivision (c), states that "[a] dependent child shall not be taken from the physical custody of his or her parents [or] guardian or guardians . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Clear and convincing evidence "requires a finding of high probability." (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

Before ordering removal, the juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home [and] shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.) Such facts may include "the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

---

sustain the allegations concerning mother's failure to protect the child.

A juvenile court's dispositional order removing a child from a parent's custody is reviewed for substantial evidence. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146-147.) In doing so, we must bear in mind the heightened burden of proof. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

**B.** ***Substantial evidence supported the juvenile court's removal order***

The juvenile court's order removing Bella from mother's care was based on the court's finding that mother failed to protect her child from father's harmful actions. The court noted that mother appeared to be under the control of father, thus declined to take action to protect her child even when the child appeared to be in medical distress. Mother failed to stop father from intervening with the child's feeding tube, failed to summon medical assistance, and failed to acknowledge that father's actions were detrimental to the child. Mother denied subsequent acts of father that endangered the child or went against medical advice. There was evidence that father was controlling of mother and did not allow mother to involve herself in the child's care without his permission. Mother remained in a relationship with father and continued to live with him. She continued to provide him with unrestricted access to the child. Neither parent had participated in services to show that they had gained an understanding of the danger of father's actions towards the child. On the contrary, mother continued to defend his actions.

Mother argues the juvenile court's order was based on the court's assumption that mother would not follow court orders, and substantial evidence did not support this assumption. Mother points out that she had extensive family support, had commenced a parenting class, and was on a wait list to enroll in counseling. Mother argues she never harmed her child, as the petition only involved father's behaviors. Under the circumstances, mother

20

argues the juvenile court should have considered whether reasonable means were available to protect the child from the father's actions without removal from mother. (§ 361, subd. (c)(1).) Mother argues such reasonable means could have included requiring mother to live with MGM or PGM, removing father from mother's home, unannounced visits, or family preservation services.[6] Mother argues the court must consider removal of one parent from the home as a lesser alternative to removal of the child from a nonoffending parent. (Citing *In re M.V.* (2022) 78 Cal.App.5th 944 (*M.V.*); *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810.)

The juvenile court acknowledged that it was required to "consider safety plans and whether there are reasonable services that could be provided to eliminate the need for the child's removal." However, the court articulated its position that "[i]n this particular case, the court does not believe that any . . . services would allow for the return of the child to either parent." In support of this statement, the court referenced the present attitude of the parents that father had done nothing wrong in placing his own judgment and decision-making above that of medical professionals. Father was not receptive to court orders or services, and mother remained "under the control of the father." It is apparent that the juvenile court did not find mother or father trustworthy or credible, therefore did not believe court orders would be sufficient to protect

---

[6]     In making this argument, mother ignores MGM's statement that she would not allow either parent to live with her given their present behaviors.

21

the child. The evidence described above supports this determination.[7]

Mother further argues that her initial lie about not witnessing the feeding tube incident is not sufficient, in and of itself, to justify removal from mother's custody. In support of this argument, mother cites *M.V., supra*, 78 Cal.App.5th at page 962 (holding that parents' "'lack of transparency' or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of the [c]hildren from either parent's custody"), quoting *In re Henry V.* (2004) 119 Cal.App.4th 522, 525 ("The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child." [Italics added.]).

Mother's initial denial of witnessing father cutting the feeding tube is not the only action of mother that led to the juvenile court's decision. In this case, it was mother's inaction—her failure to notify medical staff when her child was in medical distress and her failure to acknowledge other harmful acts on the part of father—that put the child at risk. Unlike mother, the father in *M.V.* had demonstrated "'protective capacities'" towards his children. (*M.V., supra*, 78 Cal.App.5th at p. 961.) The evidence showed that he called 911 to report an incident of domestic violence against him and later called a social worker to disclose additional incidents.

---

[7] We reject mother's argument that the juvenile court failed to state specific facts supporting its decision that there was no reasonable alternative to removal, as required by section 361, subdivision (e). The record shows that the court articulated sufficiently specific facts supporting its decision.

(*Ibid.*)  Mother, in contrast, failed to notify medical professionals of father's endangering actions and continued to defend him.  Mother's failure to protect her child from father's actions put the child at substantial risk of harm.  The record supports the trial court's decision that this very young child could not be safely maintained in mother's custody.

## DISPOSITION

The jurisdictional findings and dispositional order are affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
BENKE, J.*

---

\*        Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.